IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ELLEAN NANCE,

   Plaintiff,

v.

RASHIDA POLLION and WEXFORD
HEALTH SOUCES, INC.,

   Defendants.

Case No. 16-cv-875-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on a motion for summary judgment filed by Defendants Rashida Pollion and Wexford Health Sources, Inc. (Docs. 277, 278).[1] Plaintiff Ellean Nance has filed a response (Docs. 287, 288) in opposition to the motion. Defendants filed a reply brief (Doc. 292).

### BACKGROUND

Ellean Nance is an inmate in the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Menard Correctional Center ("Menard"). He alleges Rashida Pollion and Wexford were deliberately indifferent in diagnosing his Hepatitis B. He currently proceeds on the following counts:

 **Count 1:**  Deliberate indifference against Wexford and Rashida Pollion.

 **Count 2:**  Intentional Infliction of Emotional Distress against Wexford and Pollion.

---

[1] The motion was originally filed by Fe Fuentes, Rashida Pollion, John Trost, and Wexford Health Sources Inc. On February 7, 2020, however, the Court granted summary judgment as to Fe Fuentes and John Trost because Nance failed to exhaust his administrative remedies against them (Doc. 298). The only claims that remain in the case are the claims against Pollion and Wexford.

**Count 3:** Municipal policy claim against Wexford.

(Doc. 154, pp. 10-11; Doc. 159).

Nance does not know when or how he contracted Hepatitis B (Doc. 278-1, pp. 23-25). Hepatitis B is a virus transmitted through contact with the bodily fluid of another infected individual (Doc. 278-4, p. 3; 278-6, p. 27). Many people who contract Hepatitis B can clear the infection on their own (Doc. 278-4, p. 3; 287-16, p. 8). Intravenous drug use, unprotected sex, and receiving tattoos and piercings increase the risk of contracting Hepatitis B (Doc. 278-6, pp. 31-32; 278-4, p. 3). Nance denied using intravenous drugs prior to his incarceration and does not have any tattoos (Doc. 278-1, p. 16). He stated he did not use intravenous drugs, have unprotected sex, or report any other risky behavior throughout his incarceration, although he did drink homemade alcohol (*Id.* at pp. 25-28).

Menard regularly treated Nance for asthma and hypertension and ordered a complete metabolic panel and other labs to monitor Nance's hypertension (*See* Doc. 278-2, pp. 217-227; 278-4, p. 2; 278-7, pp. 17-18). On March 19, 2012, Nance had a comprehensive metabolic panel, which demonstrated his aspartate aminotransferase level was forty-two, with an upper level of forty (Doc. 278-2 at p. 357). Aspartate aminotransferase ("AST") and alanine aminotransferase ("ALT") are two components of liver function tests ("LFTs") (Doc. 278-6, p. 52). Mildly to moderately elevated AST and ALT enzymes (less than fifteen times the upper limits of normal) may indicate chronic liver disease (278-6 at p. 148). But transient elevations may indicate mild liver injury caused by certain substances like alcohol (Doc. 278-4, pp. 2-3). Dr. Aronsohn, Nance's retained hepatologist, explained that the March 19, 2012 results were "very mildly

elevated" (Doc. 278-6, pp. 87-88). On March 26, 2012, during a chronic care clinic visit, Pollion ordered another metabolic panel (Doc. 278-2, p. 219).

Between August 2012 and May 2013, Nance had three additional metabolic panels: on August 31, 2012 and November 15, 2012, the panel showed his LFTs were within the normal range (Doc. 278-2, pp. 361, 364); on May 22, 2013, the panel showed his ALT was within normal range but his AST was elevated to eighty-four, with a reference range of ten to forty (*Id.* at p. 366).

On August 7, 2013, Pollion saw Nance in the chronic care clinic (Doc. 278-2, pp. 42-44, 234-35). Pollion testified that the May 22, 2013 test results were not in the chart and that she ordered additional testing (Doc. 278-7, p. 74). The May panel was not printed until August 22, 2013 and signed off on August 26, 2013 (Doc. 278-2, p. 366-67). On August 28, 2013, the metabolic panel showed his AST level was elevated to forty-two, with a reference range of ten to forty (*Id.* at p. 368), but the ALT and all other LFTs were within the normal range (*Id.*).

On December 11, 2013, Pollion saw Nance in the chronic care clinic (Doc. 278-2, pp. 239-40). Pollion characterized the AST level from August 28, 2013 as very mild and found that it only warranted further monitoring (Doc. 278-7, p. 71). On March 26, 2014, a metabolic panel showed Nance's ALT and AST levels were elevated to sixty-six and fifty-two with reference ranges of ten to fifty and ten to forty, respectively (*Id.* at p. 371).

On May 15, 2014, Angela Rector saw Nance in the chronic care clinic and ordered a hepatitis panel (Doc. 278-2, p. 242-43). On May 22, 2014 the hepatitis panel confirmed Nance had Hepatitis B (*Id.* at p. 374). Dr. Trost, a medical doctor who worked for Wexford from November 2013 to March 17, 2017, noted in Nance's medical chart that the results

were inconclusive (*Id.* at p. 244). A follow-up hepatitis panel performed in November 2014 indicated Nance was still positive for Hepatitis B (*Id.* at p. 377). Nance was referred to Wexford's infectious disease specialist, Dr. Dina Paul, for further care (Doc. 278-4, p. 3). Follow-up labs from March 11, 2015 showed Nance's LFTs had reverted back to normal range (Doc. 278-2, p. 159). But due to his prior elevated levels, Dr. Paul ordered an ultrasound of Nance's liver and referred him to UIC's liver clinic for further treatment (*Id.* at p. 7; Doc. 278-4, pp. 3-4).

On May 8, 2015, an ultrasound of Nance's liver suggested underlying cirrhosis (Doc. 278-2, p. 49). On May 29, 2015, Dr. Chan recommended against initiating Hepatitis B therapy because Nance's liver disease was mild and he had normal LFTS (Doc. 278-2, p. 58). Instead, Dr. Chan decided to monitor Nance's conditions and repeat LFTs every three months (*Id.*). On December 18, 2015, a second ultrasound did not show any changes in Nance's liver (Doc. 278-2, p. 64; 278-4, p. 4). In June 2016, Dr. Chan recommended that Nance begin antiviral therapy (Doc. 278-2, pp. 91-94). Nance responded well to treatment and is not experiencing any symptoms of Hepatitis B or cirrhosis (Doc. 278-1, pp. 50-51, 118-119; 278-4, p. 4). Nance's Hepatitis B is not progressing (Doc. 278-1, pp. 50-51).

## LEGAL STANDARDS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of

material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

## B. Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (*citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The

first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

### C. Intentional Infliction of Emotional Distress

In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show: "(1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress and (3) the conduct must in fact cause severe emotional distress." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). The conduct must "go beyond all bounds of decency and be considered intolerable in a civilized community." *Id.* The emotional stress must also be severe. The "law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Welsh v. Commonwealth Edison Co.*,

713 N.E.2d 679, 684 (5th Dist. 1999) (citation omitted). Mental conditions like "fright, horror, grief, shame, humiliation, worry, etc." alone are not actionable. *Id.*

## ANALYSIS

### A. Deliberate Indifference

The only claims which remain in this case are the claims against Rashida Pollion and Wexford Health Sources, Inc. Nance has offered evidence that he suffered from a serious medical need in that he has Hepatitis B.

#### a. *Rashida Pollion*

Pollion treated Nance in the chronic care clinic from March 2012 to December 2013, prior to his diagnosis with Hepatitis B. To the extent that Nance alleges that individuals were deliberately indifferent in treating his Hepatitis B after he was diagnosed, there is nothing in the record to suggest that Pollion treated him after his diagnosis, and the individuals who treated him, namely Dr. Trost and Dr. Fuentes, were previously dismissed from the case (Doc. 298). Nance's allegations against Pollion focus on the delay in diagnosing his Hepatitis B. More specifically, Nance argues that Pollion should have ordered a hepatitis panel much earlier, and her failure to order the test delayed his diagnosis and treatment.

There is enough evidence in the record from which a jury could find that Pollion was deliberately indifferent in not ordering a hepatitis test earlier. Nance's May 22, 2013 metabolic panel showed his AST level was 84, more than double the high end of the reference range, which is 40. At the time that Pollion saw Nance on August 7, 2013, the May 22 panel was not in his medical charts, but was reviewed and signed on August 26, 2013. Pollion ordered another panel which also showed that his AST was again elevated

at 42. Thus, by the time that Pollion saw Nance on December 11, 2013, there were two test results showing an evaluated AST. Pollion did not order a hepatitis test in December, instead choosing to monitor his condition. The parties' experts dispute whether this was an appropriate response. Dr Aronsohn, Nance's expert, opined that the May 22 AST results, which were twice the upper limit of the normal range, and the August 28 AST elevated results, should have prompted a hepatitis test (Doc. 287-4, pp. 10-12). Although Pollion's expert, Dr. Gage, opined that a practical approach when there are abnormalities in the test is just to repeat the test to see if the abnormality resolves (Doc. 287-9, p. 4), a jury could find that Pollion should have ordered a hepatitis test after having two elevated test results. Dr. Aronsohn testified that the abnormal tests represented a trend which should have prompted a hepatitis test (Doc. 287-6, pp. 107-109). He also testified that any abnormal test from an incarcerated individual should prompt further care because incarcerated individuals are at a higher risk of contracting Hepatitis B (*Id.* at pp. 97, 99, 107).

Pollion argues, however, that there is no evidence in the record to suggest that she saw the May 22 results and that she was not required to review Nance's entire medical file at a chronic care appointment for asthma and hypertension. But there is evidence that the two results were in the record at the time she met with him. Further, Dr. Aronsohn testified that it was appropriate to track down the results which were not in the file or call the lab that produced them; he also testified that it was standard practice to review labs that were ordered (Doc. 278-6, pp. 102, 106-07). Because there is a dispute as to whether Pollion's actions amounted to deliberate indifference, the Court finds summary judgment inappropriate at this stage.

Pollion also argues that even if she did delay the diagnosis of Nance's Hepatitis B, he cannot show that he was harmed by that delay. A delay can amount to deliberate indifference if it exacerbates the injury or unnecessarily prolongs a plaintiff's pain. *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (internal citations omitted). Nance has offered some evidence from which a jury could find that he suffered harm. He argues that he developed cirrhosis of the liver. The medical records indicate that he has cirrhosis of the liver, but the parties dispute when that cirrhosis occurred or whether it occurred as a result of a delay in treatment. Dr. Aronsohn stated in his report that the inflammation can lead to cirrhosis and Nance was diagnosed with cirrhosis in 2015 (Doc. 287-4, pp. 5, 9). He also testified that the longer Nance went without diagnosis and treatment, the longer he suffered with untreated Hepatitis B and had more inflammation, fibrosis, and damage to his liver (Doc. 278-6, pp. 116-17). Pollion argues that Dr. Aronsohn could not say when Nance developed cirrhosis, whether it worsened during the relevant time period, or if the delay caused any damage to Nance (Doc. 278-6, pp. 78, 139-140). The Court acknowledges that the evidence is thin, but looking at the evidence in the light most favorable to Nance, a jury could find that the delay was detrimental. Because there is some evidence of harm, the Court denies summary judgment as to Pollion.

### b. *Wexford Health Sources, Inc.*

Wexford cannot be liable on the basis of *respondeat superior*, or supervisory, liability because it is not recognized under Section 1983. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (*citing Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). Instead, Nance must show that the constitutional violation was caused by a government policy or custom of the corporation. *Id*. at 789. The failure to make a policy can also be actionable. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017). Nance argues that Wexford's written materials demonstrate a deliberate policy to not require hepatitis screening for inmates with elevated LFTs and that this failure to implement a policy on testing delayed his treatment. Wexford's corporate representative testified that there were no policies for diagnosing Hepatitis B or responding to an elevated liver function test (Doc. 288-5, pp. 5-6). Dr. Aronsohn testified that inmates are at a higher risk for Hepatitis B and need regular testing and the CDC also recommends such testing (Doc. 287-4, p. 4; Doc. 287-7, pp. 24-25). Nance also points to the fact that Wexford later changed their policies to recommend testing for Hepatitis B for certain high-risk individuals (Doc. 288-5, p. 12). Thus, there is some evidence from which a reasonable jury could find "that [there was] a need to establish protocols" for screening for Hepatitis B, that Wexford failed to establish such protocols, and that the lack of such a protocol led to a delay in Nance's diagnosis. *Glisson*, 849 F.3d at 381. Accordingly, Wexford is also denied summary judgment.

### B. Intentional Infliction of Emotional Distress

The Court finds no evidence that the remaining defendants' actions amounted to intentional infliction of emotional distress. Nance only points to anxiety he experienced

after he was diagnosed with Hepatitis B but was not being treated (See Doc. 288, pp. 31-32). But the remaining claims deal only with the delay in being diagnosed. He fails to offer any evidence that he experienced anxiety due to his delay in diagnosis. Nance points out that he filed five grievances because of his anxiety, but those grievances were filed in 2016, long after he was diagnosed (Doc. 278-1, p. 114; 257-2). He fails to offer any evidence to suggest that Pollion's actions caused him any emotional distress. Accordingly, the Court **GRANTS** summary judgment on the intentional infliction of emotional distress claim.

## CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment. Summary judgment as to the deliberate indifference claims against Pollion and Wexford is **DENIED**, but they are **GRANTED** summary judgment as to the intentional infliction of emotional distress claim. To the extent Defendants sought attorney's fees for having to prepare a reply brief (Doc. 292, p. 9), that request is **DENIED**.

IT IS SO ORDERED.

DATED: March 26, 2020

*[signature: Nancy J. Rosenstengel]*

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**