IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ELLEAN NANCE,

      Plaintiff,

v.

RASHIDA POLLION and
WEXFORD HEALTH SOURCES, INC.,

      Defendants.

Case No. 3:16-CV-875-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Reconsideration filed by Defendants Rashida Pollion and Wexford Health Sources, Inc. (Doc. 301). Defendants ask the Court to reconsider its order denying in part Defendants' motion for summary judgment on the merits of Plaintiff Ellean Nance's claims of deliberate indifference (Doc. 300). Nance filed a timely response in opposition (Doc. 309), and Defendants filed a timely reply (Doc. 312). For the reasons set forth below, the motion is granted in part and denied in part.

### FACTUAL BACKGROUND

Ellean Nance is an inmate in the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Stateville Correctional Center. Nance alleges Defendants Pollion, a nurse, and Wexford were deliberately indifferent in diagnosing his hepatitis B while he was housed at Menard Correctional Center.

As reflected in the Court's Order of March 26, 2020, the following facts are undisputed for purposes of summary judgment. Menard regularly treated Nance for

asthma and hypertension, and Nance regularly had complete metabolic panels and other labs taken to monitor his hypertension (Doc. 278-2, pp. 217-227; 278-4, p. 2; 278-7, pp. 17-18). On March 19, 2012, Nance had a comprehensive metabolic panel, which showed his aspartate aminotransferase (AST) level was 42, with an upper level of 40 (Doc. 278-2 at p. 357). AST and alanine aminotransferase (ALT) are two components of liver function tests (LFTs) (Doc. 278-6, p. 52). Mildly to moderately elevated AST and ALT enzymes (less than 15 times the upper limits of normal) may indicate chronic liver disease (278-6 at p. 148). But transient elevations may indicate mild liver injury caused by certain substances like alcohol, which Nance admitted to drinking (Doc 278-1, pp. 25-28; 278-4, pp. 2-3). Dr. Aronsohn, Nance's retained hepatologist, explained that Nance's March 19, 2012 AST level was "very mildly elevated" (Doc. 278-6, pp. 87-88). On March 26, 2012, during a chronic care clinic visit for Nance's hypertension and asthma, Pollion ordered another metabolic panel (Doc. 278-2, p. 219).

Between August 2012 and May 2013, Nance had three additional metabolic panels: on August 31, 2012, and November 15, 2012, the panel showed his LFTs were within the normal range (Doc. 278-2, pp. 361, 364). But on May 22, 2013, the panel showed his AST was elevated to 84, with a reference range of 10 to 40 (*Id.* at p. 366). Thus, it was twice the normal level.

On August 7, 2013, Pollion saw Nance in the chronic care clinic (Doc. 278-2, pp. 42-44, 234-35). Pollion testified that the May 22, 2013 test results were not in the chart and, thus, were unavailable to her (Doc. 278-7, p. 74). That is because Nance's results from his May test were not printed until August 22, 2013, and were signed off on August 26, 2013,

by the prison Medical Director, who would review lab results when they arrived (Doc. 278-2, p. 366-67; 287-16 at p. 10). Without the May test results available, Pollion ordered additional testing (Doc. 287-16 at p. 9). The August 28, 2013 metabolic panel ordered by Pollion showed Nance's AST level was elevated to 42, with a reference range of 10 to 40 (Doc. 278-2 at p. 368), but his ALT and all other LFTs were within the normal range (*Id.*).

On December 11, 2013, Pollion saw Nance in the chronic care clinic (Doc. 278-2, pp. 239-40). Pollion testified that she reviewed the lab results from August 2013 and, finding Nance's AST level to be only mildly elevated, she decided only further monitoring was warranted (Doc. 278-7, p. 71). On March 26, 2014, a metabolic panel showed Nance's ALT and AST levels were elevated to 66 and 52 with reference ranges of 10 to 50 and 10 to 40, respectively (*Id.* at p. 371).

On May 15, 2014, Nurse Angela Rector saw Nance in the chronic care clinic and ordered a hepatitis panel (Doc. 278-2, p. 242-43). A week later, the hepatitis panel confirmed Nance had hepatitis B (*Id.* at p. 374). Dr. Trost, a doctor who worked for Wexford from November 2013 to March 17, 2017, noted in Nance's medical chart that the results were inconclusive (*Id.* at p. 244). A follow-up hepatitis panel performed in November 2014 indicated Nance was still positive for hepatitis B (Id. at p. 377). Nance was referred to Wexford's infectious disease specialist, Dr. Dina Paul, for further care (Doc. 278-4, p. 3). Follow-up labs from March 11, 2015, showed Nance's LFTs had reverted back to normal range (Doc. 278-2, p. 159). But due to his prior elevated levels,

Dr. Paul ordered an ultrasound of Nance's liver and referred him to the University of Illinois, Chicago's liver clinic for further treatment (*Id.* at p. 7; Doc. 278-4, pp. 3-4).

On May 8, 2015, an ultrasound of Nance's liver suggested underlying cirrhosis (Doc. 278-2, p. 49). On May 29, 2015, Dr. Chan at UIC recommended against initiating hepatitis B therapy because Nance's liver disease was mild and he had normal LFTs (Doc. 278-2, p. 58). Instead, Dr. Chan decided to monitor Nance's conditions and repeat LFTs every three months (*Id.*). On December 18, 2015, a second ultrasound did not show any changes in Nance's liver (Doc. 278-2, p. 64; 278-4, p. 4). In June 2016, Dr. Chan recommended that Nance begin antiviral therapy (Doc. 278-2, pp. 91-94). Nance responded well to treatment and is not experiencing any symptoms of hepatitis B or cirrhosis (Doc. 278-1, pp. 50-51, 118-119; 278-4, p. 4). Nance's hepatitis B is not progressing (Doc. 278-1, pp. 50-51).

## PROCEDURAL HISTORY

Nance filed the original complaint in this lawsuit on August 3, 2016, alleging violations of his Eighth Amendment rights at Stateville Correctional Center from 1995 to 2004 and Menard Correctional Center from 2009 to 2015 (Doc. 1). Nance alleged he was denied adequate medical care for his hepatitis B for years. Instead of properly diagnosing and treating the condition, prison medical staff prescribed him ibuprofen and ignored his abnormal blood test results and complaints of pain. He maintained their ineffective treatment with ibuprofen only exacerbated his condition, resulting in cirrhosis of the liver and enlargement of his spleen (*Id.*)

After the filing of a fourth amended complaint, several court orders, and the

dismissal of several parties due to settlement, the only claims remaining at summary judgment were Nance's claims that Pollion and Wexford were deliberately indifferent to his serious medical needs (Count 1), that Pollion and Wexford intentionally inflicted emotional distress (Count 2), and that Wexford maintained an unconstitutional policy or practice (Count 3). Pollion and Wexford moved for summary judgment on Nance's claims (Doc. 277), and the undersigned granted the motion in part. Specifically, the Court found that summary judgment should be granted to Defendants on Nance's claim of intentional infliction of emotional distress, but that Nance could proceed on his claims of deliberate indifference against both Pollion and Wexford. Defendants now ask the Court to reconsider its order and grant summary judgment in full.

LEGAL STANDARDS

**A.     Motion to Reconsider**

Motions to reconsider an interlocutory order are properly brought pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, as the rule provides that an order adjudicating fewer than all the claims among the parties "may be revised at any time" before the entry of a final judgment. FED. R. CIV. P. 54(b). Motions to reconsider under Rule 54(b) are judged by largely the same standard as motions to alter or amend a judgment under Rule 59(e) and serve a limited function: to correct manifest errors of law or fact. *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987).

"A manifest error is not demonstrated by the disappointment of the losing party." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quotation omitted). A motion to reconsider is only proper where the Court has misunderstood a party, where

the Court has made a decision outside the adversarial issues presented to the Court by the parties, where the Court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). "Such problems rarely arise and the motion to reconsider should be equally rare." *Id.* at 1192 (citation omitted).

**B.     Deliberate Indifference**

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)); *see also Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further

significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

## DISCUSSION

**A.    Deliberate Indifference by Rashida Pollion**

In its discussion regarding Defendant Pollion, the Court noted that Nance's allegations against Pollion focus on the delay in diagnosing his hepatitis B. Specifically, Nance argued that Pollion should have ordered a hepatitis panel much earlier, and her failure to order the test delayed his diagnosis and treatment. The Court found that by the time Pollion saw Nance on December 11, 2013, there were two test results showing an evaluated AST: the May 22, 2013 metabolic panel in which Nance had an AST level of 84, and the August 28, 2013 metabolic panel in which his AST level was 42. Yet, at that December 11, 2013 chronic care clinic visit, Pollion decided to monitor Nance's levels rather than order further testing.

The Court also considered the parties' conflicting expert testimony. Dr Aronsohn, Nance's expert, opined that the May 22, 2013 AST results, which were twice the upper limit of the normal range, and the August 28, 2013 AST elevated results should have prompted a hepatitis test (Doc. 287-4, pp. 10-12). Pollion's expert, Dr. Gage, opined that

repeating the test and waiting to see if the issue resolved was a practical approach to take when presented with such abnormal test results (Doc. 287-9, p. 4).

Finally, the Court considered Pollion's argument that there was no evidence to suggest she ever saw the May 22, 2013 test results and that she was not required to review Nance's entire medical file at a chronic care appointment for asthma and hypertension. Nevertheless, the Court found there was evidence that the May 22, 2013 results were in the record at the time she met with Nance in December. Further, Dr. Aronsohn testified that it was appropriate to track down results that are not in a file or call the lab that produced them; he also testified that it was standard practice to review labs that were ordered (Doc. 278-6, pp. 102, 106-07). Based on this evidence, the Court concluded that a jury could potentially find that Pollion was deliberately indifferent in not ordering a hepatitis test earlier.

Defendants first assert this conclusion misapprehends the law in that the Court misapplied a medical malpractice negligence standard rather than the familiar deliberate indifference standard. That is, there is no evidence Pollion actually knew that Nance was experiencing a serious medical need and deliberately disregarded that risk. Defendants argue the Court's finding that Pollion should have done more to find Nance's May 2013 lab report—without any signs, symptoms, history, or recent exposure to hepatitis B— erodes a Section 1983 claim into a state law medical malpractice claim. Second, Defendants assert there is no evidence Nance suffered any "lasting harm," from the six-month delay in ordering a hepatitis panel; thus, Pollion should be dismissed.

In response, Nance argues it is undisputed that when Pollion saw Nance in

December 2013, she had access to both the May 2013 and August 2013 blood tests—that is, two consecutive reports showing elevated LFTs, including the May 22, 2013 report with an AST level that was more than twice the upper limit of normal. Nance also argues there is a dispute of fact as to whether Pollion should have reviewed Nance's recent lab reports and ordered a hepatitis panel in response. Furthermore, there is evidence that Nance suffered harm. Dr. Aronsohn testified Nance likely had hepatitis in 2013, which went undiagnosed. Both experts agreed that treatment for hepatitis can reduce the risk of developing cirrhosis. And both experts agreed that Nance had cirrhosis by at least May 2015. Thus, a jury could find that Pollion's delay caused some degree of harm to Nance.

"Prison physicians will be liable under the Eighth Amendment if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (quoting *Gonzalez v. Feinerman*, 663 F.3d 311, 313 (7th Cir. 2011)). "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Id.* (citation omitted). "Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment. In some cases, even brief, unexplained delays in treatment may constitute deliberate indifference." *Id.* (citation omitted).

Evidence of medical negligence is not enough to prove deliberate indifference. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) ("While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme

Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference."). Thus, without more, a mistake in professional judgment cannot be deliberate indifference "because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* (*quoting Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). "A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment." *Id.*

On the other hand, where evidence exists that a defendant knew better than to make the decision she did, or where a reasonable jury could conclude that a defendant didn't honestly believe her proffered medical explanation, then summary judgment is improper. *Petties*, 836 F.3d at 730–31. State-of-mind evidence sufficient to create a question of fact for the jury includes the obviousness of the risk from a particular course of medical treatment, the defendant's persistence in "a course of treatment known to be ineffective," or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment. *Whiting*, 839 F.3d at 663 (quoting *Petties*, 836 F.3d at 730).

After reviewing the record, the Court agrees with Defendants that it should have dismissed Pollion. Pollion testified that Nance's May 22, 2013 test results with the elevated AST levels were not in the file when she saw him at the chronic care clinic on August 7, 2013. And, based on the summary judgment evidence, they could not have

been. The May 22, 2013 results were not printed until August 22, 2013, and were signed off on August 26, 2013 by the prison Medical Director. Because there were no recent labs in the record, Pollion ordered new ones. Her failure to seek out the May 22, 2013 test results could be used to demonstrate medical negligence, but it does not prove that she *knew* of a serious risk to Nance's health and deliberately disregarded it. Indeed, while Dr. Aronsohn testified that it would have been appropriate for Pollion to track down the May 2013 results and review them before deciding what course of action to take, this testimony only shows how a reasonable medical professional should have acted in that situation. *Id.* at 663 (citing *Duckworth v. Ahmad*, 532 F.3d 675, 681 (7th Cir. 2008)). It does not "shed any light" into Pollion's state of mind. *Id.* "In other words, Dr. Aronsohn's testimony "reiterate[d] the standard for medical malpractice, which falls short of deliberate indifference." *See id.*

When Pollion next saw Nance in December 2013, she testified that she reviewed his most recent lab results from August 28, 2013, and noted Nance had a very mildly elevated AST of 42 (Doc. 178-7 at pp. 70-71). Nance's ALT and his bilirubin levels were normal (*Id.* at p. 71). Based on those numbers, Pollion did not believe any additional medical care was needed other than monitoring (*Id.*). Thus, even if the May 2013 results were in Nance's file when Pollion reviewed it in December 2013, the evidence in the record is that Pollion did not look at them. And given his mildly elevated AST level of 42, and the fact that Nance had no other clinical signs or symptoms of hepatitis B at that time, Pollion decided based on her medical judgment that further monitoring was medically warranted. At most, Pollion's failure to look at Nance's results from the May 2013

metabolic panel and order a hepatitis B test amounts to medical negligence, and, again, medical negligence is not enough to prove deliberate indifference.

To survive summary judgment, Nance needed to present evidence sufficient to show that Pollion's decision to monitor his AST level rather than order a hepatitis B test was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Whiting*, 839 F.3d at 664. Nance failed to do that.

Furthermore, no reasonable jury would find that Pollion's alleged six-month delay in testing Nance for hepatitis B exacerbated Nance's injury. It is true, as Nance points out, that untreated hepatitis B may lead to increased inflammation, fibrosis, and liver damage. But, even after Nance's diagnosis, his physicians did not feel treatment was warranted. In March 2015, Nance's AST and ALT levels were both within the normal range (Doc. 278-2, 159). Dr. Chan at UIC decided not to treat Nance's hepatitis until June 10, 2016, which Dr. Aronsohn agreed was not outside the standard of care, as hepatitis B is a condition that advances over decades (Doc. 287-2 at p. 24). Based on this evidence, a reasonable factfinder would not conclude that the six-month delay in hepatitis testing due to Pollion's decision to monitor Nance's AST level exacerbated Nance's injury.

For these reasons, the Court agrees with Defendants that it made a mistake of law when it denied summary judgment to Defendant Rashida Pollion. She will be dismissed as a party to this matter.

**B.     Deliberate Indifference by Wexford Health Sources, Inc.**

In its order, the Court denied summary judgment to Wexford, finding there was

some evidence from which a reasonable jury could find "that [there was] a need to establish protocols" for screening for hepatitis B, that Wexford failed to establish such protocols, and that the lack of such a protocol led to a delay in Nance's diagnosis (Doc. 300). The evidence supporting this conclusion included: (1) Wexford's written materials, which Nance claims demonstrate a deliberate policy to not require hepatitis screening for inmates with elevated LFTs; (2) testimony from Wexford's corporate representative that there were no policies for diagnosing hepatitis B or responding to an elevated LFTs; (3) Dr. Aronsohn's testimony that inmates are at a higher risk for hepatitis B and need regular testing, which the CDC recommends; and (4) the fact that Wexford later changed their policies to recommend testing for hepatitis B for certain high-risk individuals.

Defendants now argue that Wexford's change in policy is a subsequent remedial measure that was an improper basis for the Court's decision. In response, Nance asserts Defendants forfeited this argument by not raising it in their summary judgment briefing. Defendants claim they could not have forfeited the argument because it was not an issue until the Court's summary judgment order, but that's not true. In his summary judgment brief, Nance stated: "Perhaps recognizing the risks, Wexford later added written recommendations in 2016—too little, too late for Mr. Nance—that patients beyond just "HIV [positive], pregnant, and dialysis[-receiving]" inmates get screened for hepatitis B. (Doc. 288 at p. 28). Defendants did not respond to this argument in their summary judgment briefing. Even if the argument was not forfeited, however, Federal Rule of Evidence 407 only prohibits admission of a subsequent remedial measure to prove

negligence, culpable conduct, a defect, or a need for a warning or instruction. FED. R. EVID. 407. The evidence certainly could be admissible for a number of other reasons.

Defendants also argue that Dr. Aronsohn's report is mistaken when it says the CDC *recommended* hepatitis B testing in 2013 when, in reality, the CDC *indicated* that "[c]orrectional facilities should consider routine testing of long-term inmates for chronic HBV infection [] to facilitate rapid vaccination of contacts, direct counseling for preventing secondary transmission, and ensure medical evaluation of infected persons." (Doc. 287-7, pp. 19, 27). The CDC explains that a guideline is "indicated," based on "previous scientific observation and theoretic rationale" but when "case-controlled or prospective studies do not exist." (*Id.*). But regardless of whether testing of inmates is "indicated" or "recommended," Dr. Aronsohn testified that inmates are at a higher risk for hepatitis B and need regular testing, and the CDC's guidelines *indicate* that testing of long-term inmates such as Nance should be considered by correctional facilities. This is all evidence a jury can consider when determining Wexford's liability.

Defendants next argue that the Court only considered written policies in coming to its ruling and failed to account for any oral recommendations and training that Wexford provided. Additionally, Wexford required no prior approval for ordering a hepatitis test, and practitioners were expected make their own judgments as to whether an inmate required testing. While it may be true that Wexford's employees were permitted to order hepatitis tests as necessary, that argument has nothing to do with Wexford's alleged failure to supply appropriate policies and training related to hepatitis B. The Court assures Defendants it considered all evidence in coming to its conclusion.

Finally, Wexford argues that its policy was not a "moving force" in this case. That is, there is no evidence that Pollion's failure to order a hepatitis panel was due to a lack of policy. Even if Wexford had a written policy in 2013 that instructed medical providers on when to order a hepatitis panel, it would not have had an effect on this case because Pollion did not see the May 2013 laboratory report. But as argued by Nance, the issue is not whether a policy would have had any effect on Pollion's specific actions, but whether the existence of a policy requiring testing for long-term inmates or those with elevated LFTs would have allowed Nance to be tested earlier, by Pollion or any other Wexford provider. Thus, the Court finds that it committed no manifest error as to Wexford.

## Conclusion

For these reasons, the Motion for Reconsideration filed by Defendants Rashida Pollion and Wexford Health Sources, Inc. (Doc. 301) is **GRANTED in part and DENIED in part**. Judgment as a matter of law is **GRANTED** to Defendant Pollion, and she is **DISMISSED with prejudice**.

This case shall now proceed to trial as to Plaintiff Ellean Nance's claim of deliberate indifference against Wexford Health Sources, Inc. A status conference will be set by separate order to set a firm trial date.

**IT IS SO ORDERED.**

DATED: March 8, 2021

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**